UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DIMAS GARZA #270734,                              Case No. 2:17-cv-00104

        Plaintiff,                              Hon. Gordon J. Quist
                                         U.S. District Judge

    v.

ROBERT NAPLES, et al.,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

### Introduction

This is a civil rights action brought by state prisoner Dimas Garza pursuant to 42 U.S.C. § 1983.  Garza claims that the eight Defendants – Warden Naples[1], Assistant Deputy Wardens Alexander and Schroeder, Inspectors Niemisto and Tasson, Resident Unit Manager (RUM) Viitala, Asst. Resident Unit Supervisor (ARUS) Cesarek, and Security Threat Group (STG) Sergeant Lee – failed to protect him from assaults by two inmates at the Marquette Branch Prison (MBP) in 2016 after Garza reported the threats to his safety.

Garza asserts constitutional violations under the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments, and asserts state law violations of ethnic intimidation, assault, abuse of process, and libel and slander.

The factual scenario in this case requires a brief introduction.   Part of Garza's current case has its roots in 1998.   That year, Garza was sentenced to a life sentence

---

[1] Defendant "Naples" is correctly spelled as Napel.   (ECF No. 69-6, PageID.574.)

for felony-murder arising out of a robbery.    Garza drove the get-away vehicle while his co-defendants entered the home of Nelson Gonzalez.    One of Garza's accomplices, Anthony Martinez, shot and killed Nelson Gonzalez during the robbery. Gonzalez's thirteen-month old son – Nelson Gonzalez, Jr. – was injured in the shooting.    Nelson Gonzalez, Jr. recovered, grew up, and eventually committed a crime that landed him in MBP *at the same time that Garza was there.*

Gonzalez, Jr., however, was not the only prisoner in MBP who was mad at Garza.    Prior to the first assault at issue in this case, which took place in October 2016, Garza was involved in an attempted scheme to smuggle suboxone strips into the prison.    MDOC officials learned of Garza's involvement after investigating Inmate Korte and his mother Stacey Dolson.    The investigation ultimately revealed Garza's involvement in the smuggling.    Garza was found guilty of a misconduct for attempted smuggling and was placed in administrative segregation for 30 days.[2] After 30 days, Garza was interviewed and reclassified to general population.    Garza signed the reclassification form without expressing safety concerns.    Although the facts are a bit confusing, it appears that Garza's involvement in smuggling into or within the prison caused Korte to hold some animosity for Garza.

---

[2]    MDOC's Offender Tracking Information System (OTIS) indicates that Inmate Matthew Korte was convicted of furnishing contraband to a prisoner in prison, in violation of Mich. Comp. Laws § 800.821(1).    According to OTIS, this offense took place in Marquette County on April 1, 2016.    *See* http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=775049 (visited on Sept. 11, 2019).

At some point, Nelson Gonzalez, Jr., who was incarcerated at MBP, learned that Garza was also being incarcerated at MBP.   When the opportunity arose, he stabbed Garza multiple times with a makeshift knife.   Garza suffered a collapsed lung and was rushed to Marquette General Hospital, where he received treatment. Garza recovered from his injuries and returned to MBP.   Garza initially was placed in MBP quarantine for his protection.

After recovering from his injuries, Garza agreed to his release to the general population.   Once in general population, prisoner Korte assaulted Garza by repeatedly punching Garza in the head.   Garza suffered with bruising around his eyes.

Garza filed this lawsuit in 2017.   This Report and Recommendation addresses:

1)  Defendants' motion for summary judgment (ECF No. 68) and,

2)  Plaintiff's motion for summary judgment.   (ECF No. 77.)

I respectfully recommend that Defendants' motion for summary judgment be granted in part and denied in part, and that Plaintiff's motion for summary judgment be denied.

## Plaintiff's Factual Allegations

Garza stated that he arrived at MBP in April of 2016, and was confined in G-block, because he had enemies in B-block.   (ECF No. 9, PageID.162.)   Garza moved into administrative segregation during August 2016, after the smuggling attempt discussed above.   (*Id*.)   Garza says he then learned that Gonzalez, Jr., who resided

at MBP, wanted to kill him to get revenge for his father's murder.    (*Id.*)    On August

28, 2016, Garza kited Defendant Naples and requested protection.    (*Id.* at

PageID.163.)

Garza says that Defendants Viitala and Lee stopped at his cell on or about

September 1, 2016, to discuss the kite.    (*Id.*)    When Garza informed him of the

threat, Defendant Viitala allegedly stated, "ain't no one going to do nothing to 'Big D',

you run the operation."    (*Id.*)    Garza states that he is known as "Big D" among

prisoners.    (*Id.*)    Defendant Viitala stated that he would investigate, but Defendant

Lee told Garza that he (Lee) did not believe Garza.    (*Id.*)

Garza says that, on another occasion, Defendant Niemisto told Garza that he

would investigate.    (*Id.*)

Garza also says that during rounds in mid-September, he told Defendants

Alexander and Schroeder about his concerns.    They allegedly stated that they would

tell the Inspector and STG Sergeant to investigate the matter and speak with Garza.

(*Id.*)

Garza says that he asked each Defendant for protection and for a transfer to a

different facility.    (*Id.* at PageID.164.)    Garza had his family speak with Defendants

to address his concerns for protection.    (*Id.*)    Garza informed Defendants that the

victim's son (Gonzalez, Jr.) was in B-block with Garza, but Garza did not know what

he looked like.    (*Id.*)    Defendants told Garza that nothing would happen and that

he should stop writing and requesting protection.    (*Id.*)    Defendants told Garza that

there was no room in segregation and that a transfer was possible, but that he needed

4

to stop making requests because it would only get worse for him.    (*Id*.)    Garza says

that this conversation caused other prisoners to believe that he was a "rat-informant."

Garza says that Defendants refused to place Garza in protective custody, and placed

his life in danger by calling him a snitch.    (*Id*.)

On October 6, 2016, Garza visited the "Security Threat Group yard" with all

the violent and dangerous gang-members.    (*Id*. at PageID.165.)    Garza went into

the unsupervised kiosk room, which is where, according to Garza, ninety-five percent

of all inmate assaults occur.    (*Id*.)    There, Garza was assaulted and stabbed nine

times by Gonzalez, Jr.    (*Id*.)    Garza asserts that the Corrections Officers watched

the assault take place and did nothing to intervene until the Gonzalez, Jr. left the

kiosk room.    (*Id*.)

Garza states that he was rushed to the hospital and almost died from his

injuries.    (*Id*.)    Garza suffered multiple stab wounds and a punctured lung, and was

saved by emergency surgery.    (*Id*.)

Garza returned to MBP on October 11, 2016, and was placed in quarantine

until he was released into the general population on October 27, 2016.    (*Id*. at

PageID.166.)    Garza was housed in the same unit with Inmate Korte, whose mother

Stacey Dolson, was arrested for her involvement with Garza in the attempted

smuggling scheme. (*Id*.)    Garza visited the "Security Threat Group yard" again on

October 28, 2016.    (*Id*.)    Garza says that, within five minutes of being in the yard,

he was assaulted.    (*Id*.)    Defendant Lee visited Garza in quarantine after the second

assault to inform Garza that they had arrested the son of the mother involved in the smuggling scheme for the assault.   (*Id.*)

**Summary Judgment Standard**

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

**Qualified Immunity**

Defendants argue that they are entitled to qualified immunity on each of Garza's federal claims because Garza has failed to establish that each Defendant violated clearly established federal law.   "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly

6

established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).    Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?    Second, was the right clearly established at the time of the violation?" *Id.* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

"A right is 'clearly established' for qualified immunity purposes if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 202, (2001)). The inquiry whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201; *see also Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (directing courts "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced") (internal quotation marks and citations omitted). Thus, the doctrine of qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Humphrey*, 482 F.3d at 847 (internal quotation marks omitted).

"The relevant inquiry is whether existing precedent placed the conclusion" that the defendant violated the plaintiff's rights "in these circumstances 'beyond debate.'"

*Mullenix v. Luna*, 36 S.Ct. 305, 309 (2015), citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### Eighth Amendment Failure to Protect

Defendants argue that they are entitled to qualified immunity on Garza's Eighth Amendment claims because they were not aware of any conflicts between Garza and Gonzalez, Jr. or between Garza and Korte.  Garza argues that he informed each Defendant personally by asking for protection from inmate Gonzalez, Jr. and by sending duplicate kites to each Defendant.  Additionally, Garza says that his family members telephoned the prison and spoke to Defendants about the risk of assault, and that each Defendant should have known of the risk of assault by reviewing his records contained within the MDOC database.

Under the Eighth Amendment, a prison official has a duty to protect an inmate from violence caused by other prisoners.  *Wilson v. Sieter*, 501 U.S. 294, 303 (1991); *Nelson v. Overberg*, 999 F.2d 162, 165 (6th Cir. 1993); *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990); *Roland v. Johnson*, 856 F.2d 764 (6th Cir. 1988); *McGhee v. Foltz*, 852 F.2d 876, 880-81 (6th Cir. 1988).  "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citations omitted).  Recognizing that a prison official has an obligation to protect an inmate from assault by another inmate, the Supreme Court defined deliberate indifference as requiring a showing that the prison official consciously disregarded a substantial risk of serious harm to plaintiff.  *Id.* at 839.  The court stated:

- 8 -

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .   But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as infliction of punishment.

*Id.* at 837.   Thus, in order to support a claim that a prison official failed to protect plaintiff, two conditions must be satisfied:   (1) the inmate must show that a substantial risk of harm was present and (2) that the defendants, having knowledge of that risk, possessed a culpable state of mind. *Id.*

In order to support an Eighth Amendment claim, Garza must establish "something more than a lack of ordinary due care, inadvertence, or error; the conduct must instead be 'obdurate' or 'wanton'--exhibiting recklessness or callous neglect." *Id.* at 165.   *See also Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992); *Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990); *McGhee v. Foltz*, 852 F.2d 876, 881 (6th Cir. 1988).   An error of judgment does not subject a prison official to liability.   *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993) (errors of judgment are shielded by qualified immunity); *Marsh v. Arn*, 937 F.2d at 1069.

In *Stewart v. Love*, 696 F.2d 43 (6th Cir. 1982), the Sixth Circuit affirmed the dismissal of a prisoner's complaint that prison officials failed to protect him.   In that case, prison officials transferred plaintiff for a period of six months to another prison cell after plaintiff informed the officials that he feared for his safety.   Plaintiff was

then transferred back to his original cell.   Plaintiff informed his counselor that he feared for his safety, because he had heard rumors regarding a planned attack.   The court noted that plaintiff made only general allegations that someone was going to hit him on the head.   Plaintiff was subsequently assaulted.   In dismissing the claim, the court found that defendants were not deliberately indifferent to a known risk of harm to plaintiff and concluded that defendants, at most, were guilty of mere negligence which failed to rise to the level of an Eighth Amendment violation.

**1.    Gonzalez, Jr.'s assault on Garza on October 6, 2016**

Garza provides several arguments in support of his contention that each Defendant knew that Garza was involved in the murder of Gonzalez, Jr.'s father, and was aware that Gonzalez, Jr. was seeking to avenge his father's death.   His arguments are summarized below:

1) Garza's record is contained within prisoner Gonzalez, Jr.'s Presentence Investigation (PSI) Report.   Garza alleges that the PSI Reports are available in the MDOC database and each Defendant had access to the reports. (ECF No. 78, PageID.736.)

2) An e-mail through the J-Pay system was intercepted from Latin Counts group member, prisoner Ruben DeJesus.   The email noted that Gonzalez was a threat to Garza.   This was documented in a December 17, 2014, Request for Protection/ Investigation Report (CSJ-686) dated 12-17-14 (ECF No. 74-1, PageID.692), which allegedly shows

that Garza was at risk of assault from prisoner Gonzalez, Jr.   (*Id*. at PageID.736-737, 761-762.)

      3)   Garza says that he wrote duplicate kites to each Defendant.

      4)   Garza says that he personally spoke to each Defendant about Gonzalez, Jr. while each Defendant conducted rounds in his prison unit.

      5) Prisoner Paul Kempf submitted an affidavit that states he heard Garza speak to Defendants Viitala and Lee regarding the assault threat from prisoner Gonzalez, Jr.   (*Id*. at PageID.694-695, ECF No. 78, PageID.751.)

      6)   Garza presented affidavits from two family members, who state that they telephoned the prison and voiced concerns that Garza was in danger if he was housed with prisoner Gonzalez, Jr.

The Court will address each argument in order.

## PSI Reports

Garza argues that the PSI Reports are available to each Defendant and a review of the reports shows a direct conflict between prisoner Gonzalez, Jr., and Garza.   Defendant Tasson attests that, after the October 6, 2016 attack, he reviewed both Gonzalez, Jr.'s and Garza's PSI Reports.   (ECF No. 69-8, PageID.589.) Gonzalez, Jr.'s PSI Report did not reference Garza.   The report did mention Garza's co-defendant, Anthony Martinez, as the individual responsible for the murder of Gonzalez, Jr.'s father.   (*Id*.)

Garza's PSI Report indicated that Martinez was involved with Garza in events that led to Garza's conviction.   (*Id.*)   In order to discover evidence linking Gonzalez, Jr. and Garza, both PSI Reports would need to be reviewed together with the knowledge that Martinez was the common link between the two prisoners.

The record, however, does not establish that each Defendant had access to the PSI Reports, or that any Defendant had reviewed the reports.   Moreover, even if the PSI Reports could establish a conflict between Garza and Gonzalez, Jr., Garza failed to establish that each Defendant actually recognized that connection and disregarded a recognized threat to Garza.

### J-Pay e-mail and Protection/Investigation Report

Garza argues that, based upon the December 17, 2014 interception of an e-mail sent through the J-Pay system at Baraga Correctional Facility (AMF), Defendants had knowledge of the conflict he had with Gonzalez, Jr.   That e-mail was sent to prisoner DeJesus from his aunt.   The e-mail informed prisoner DeJesus that the man who killed his uncle was in the same prison.   The e-mail referred "to Nelson's dad['s] death."

As a result, AMF Deputy Warden Lesatz and SCC staff member S. Niemi placed Garza in temporary segregation before transferring Garza away from prisoner DeJesus.   This did not result in a SPON [3] between Gonzalez, Jr. and Garza.

---

[3]    A Special Problem Offender Notice (SPON) is placed in a prisoner's file when a known conflict exists between prisoners.   MDOC policy directive 03.03.110. (ECF No. 69-2, PageID.540-541.)

- 12 -

Furthermore, none of the Defendants could have been involved in this protection request because this incident occurred at AMF and not at MBP.

Defendants cannot be faulted for failing to make the connection between Gonzalez, Jr. and Garza from an AMF J-pay email intercepted in 2014.   In the opinion of the undersigned, Garza has not shown that any Defendant was aware of the e-mail or had knowledge of the content of the e-mail.

### Kites and Requests for Protection

Garza says that he sent "duplicate kites" to each Defendant.   He points to two copies of kites in the record:  (1) the kite addressed to Assistant Deputy Warden (ADW) Alexander dated September 11, 2016, with a "carbon copy" (or "cc") notation to Naples, Schroeder, Viitala, Lee, and Niemisto, and (2) the kite addressed to ARUS Cesarek dated October 2, 2016, with the names Naples, Alexander, Schroeder, Niemisto, Lee, and Viitala listed at the bottom.

In addition, Garza asserts that he personally spoke with each Defendant when they were in his prison unit.   Defendants deny that Garza asked them for protection from Gonzalez, Jr.   In the opinion of the undersigned, Garza has asserted sufficient allegations to raise a genuine issue of material fact on the issue of whether each Defendant had notice of Garza's fear of assault from Gonzalez, Jr.

### Affidavit of Prisoner Paul Kempf

Garza submitted an affidavit from prisoner Paul Kempf to support his assertion that he informed Defendants before the assault about his need for protection from prisoner Gonzalez, Jr.  (ECF No. 74-1, PageID.694-695.)   Kempf

attests that he witnessed Garza tell RUM Viitala and STG Sgt. Lee about his need for protection from prisoner Gonzalez, Jr. because Gonzalez, Jr. wanted to avenge his father's death by attacking Garza.   Defendant Viitala responded that they knew about the situation already, and Defendant Lee allegedly stated that he did not believe Garza and to stop bothering him.   Kempf states that Defendant Lee call Garza "a rat" and informed him that they "were going to shoot words out to G.P. to let everyone know he prisoner Dimas Garza was telling."   Kempf asserted that he knew that this conversation took place in early September during the morning hours about one week before the stabbing because this occurred around the time period that SCC review hearings were being conducted.   In the opinion of the undersigned, the Kempf affidavit raises genuine issues of fact regarding whether Defendants Viitala and Lee had knowledge of Garza's fear of assault from Gonzalez, Jr.

### Affidavits from Debbie Garza and Stella Garza

Garza presented an affidavit from his niece Debbie Garza.[4]  (ECF No. 9-1, PageID.226.)   Debbie Garza states that she received a letter from Garza asking her to telephone Naples, Viitala, Tasson, and Niemisto to inform them of the threat from Gonzalez, Jr.   (*Id*.)   Debbie Garza states that she made several telephone calls and "spoke to few of the people." (*Id*.)   She was told not to worry because Garza was in segregation and nothing would happen.   (*Id*.)   After the stabbing incident, she

---

[4]      Garza testified at his deposition that Debbie Garza is his sister.   (ECF No. 69-13, PageID.613.)   Debbie Garza wrote in her affidavit that she is Garza's niece.

states that she telephoned Inspector Niemisto and made a second telephone call to an Assistant Warden.   (*Id*.)

Garza also presented an affidavit from his niece Stella Garza.   (*Id*. at PageID.227.)   After she received a letter from Garza with "a list of names of employees" to call at MBP, she and her mother made telephone calls to several of the employees listed.   (*Id*.)   Stella Garza states that she spoke with the warden, who indicated to her that he would look into the issue and speak with Garza.   (*Id*.)

Stella Garza states that she again spoke with the warden and he told her that the inspector, the STG coordinator, and the RUM were investigating.   (*Id*.)   She then called RUM Viitala and two different inspectors concerning the letter.   (*Id*.)   Each person she spoke with told her that Garza was in segregation pending a transfer.   (*Id*.)   Stella Garza states that she then spoke with a "Deputy named Schro[e]der" who indicated that she was aware of the situation and they were looking into a transfer.   (*Id*.)   She then telephoned Defendant Niemisto who told her they were investigating and doing their jobs.   (*Id*.)

After Stella Garza received a letter in October from Garza stating that he was moving from segregation into general population, she spoke with the ARUS and a RUM who both told her that there was no room in segregation and that they could not place Garza in protection.   (*Id*.)

After the stabbing, she telephoned "Deputy Alexander and Deputy Schro[e]der," who both told her that they could not give her information because she was not on Garza's emergency contact list.   (*Id*.)   In the opinion of the undersigned,

the affidavits of Debbie Garza and Stella Garza raise genuine issues of material fact regarding whether each Defendant had knowledge of Garza's fear of assault.

The undersigned will attempt to summarize Defendants' evidence and arguments in support of their motion for summary judgment below:

1) No Defendant received a kite or spoke with Garza regarding a threat or a protection request.

2) Defendant Schroeder was not assigned as the acting ADW until after Garza was assaulted by Gonzalez, Jr., which tends to establish that Garza fabricated his claims by asserting that he spoke with ADW Schroeder before Gonzalez, Jr.'s assault, and by presenting affidavits from family members that indicate that they had spoken with ADW Schroeder before the assault.

3) Garza was interviewed by Deputy Warden Erica Huss and Defendant Niemisto before he was released to general population.  A Segregation Behavior Review form shows that Garza agreed to his release into the general population and expressed no concerns about his safety.

4)   After the Gonzalez, Jr.'s assault, Defendant Tasson interviewed Garza at the hospital and explained to Garza what he learned about prisoner Gonzalez, Jr.  Garza responded, "What? No, I don't know that guy."  (ECF No. 69-5, PageID.567.)

5) Garza refused to identify Gonzalez, Jr. or provide any information concerning the assault when he was asked by Michigan State Police investigators.   (ECF No. 69-4, PageID.558-563.)

6) Defendant Lee attests that he was never informed by Garza or his family members about any concerns regarding Gonzalez, Jr.   (ECF No. 69-5, PageID.565-568.)

7) Defendant Naples attests that Garza never informed him about concerns regarding his relationship with Gonzalez, Jr. and his need for protection.   (ECF No. 69-6,  PageID.572-574.)   Defendant Naples attests that he never spoke with any of Garza's family members.   (*Id.*) Defendant Naples's only involvement in this matter was to review the incident report that MDOC staff prepared after the stabbing incident. (*Id.*)

8) Defendant Schroeder works as an administrative assistant and litigation coordinator and has held that position since 2008.   (ECF No. 69-7, PageID.576-578.)   She became the acting ADW on October 10, 2016, which was after the Gonzalez, Jr. assault.   (*Id.*)   Defendant Schroeder states that she had no knowledge of a relationship between Garza and Gonzalez, Jr., never spoke with Garza about Gonzalez, Jr., never received a kite from Garza regarding a request for protection from Gonzalez, Jr., and never spoke with Garza's family members.   (*Id.*)

9) Defendant Tasson attests that Garza never informed him verbally or by kite about a fear of assault, and that he never received any telephone calls from Garza's family members.  (ECF No. 69-8, PageID.588-590.)    After Garza sustained injuries in the attack, Defendant Tasson interviewed Gonzalez, Jr. and learned of the reason for the attack.  (*Id*.)   Defendant Tasson reviewed the PSI Reports after the attack and states that there was no SPON between Garza and Gonzalez, Jr. before the incident.    (*Id*.)

10) Defendant Viitala states that he knows Garza by "D" and has a positive relationship with him.  (ECF No. 69-9, PageID.592-594.) Defendant Viitala says that he never spoke with Garza about an issue with prisoner Gonzalez, Jr., never received a kite from Garza, and never spoke with Garza's family members.  (*Id*.)   Defendant Viitala did not learn of a relationship between Garza and Gonzalez, Jr. until after the October 6 attack. Defendant Viitala further states that requests for protection are common in the prison.   Defendant Viitala has been involved in approximately 300 investigations over a three-year period and would have investigated Garza's concerns if he had any knowledge of them.  (*Id*.)

11) Defendant Niemisto worked as an inspector at MBP during the time of the incident.    (ECF No.  69-10,  PageID.596-598.) Defendant Niemisto attests that he never spoke with Garza about a

need for protection, never received a kite requesting protection, and has no recollection of speaking to any of Garza's family members over the telephone. (*Id*.)

12) Defendant Niemisto interviewed Garza with Deputy Warden Huss on September 29, 2016, prior to reclassifying him from administrative segregation to general population. Garza signed the reclassification form and did not express any concerns about returning to general population. (*Id*. at PageID.600.)

13) Defendant Alexander states that he was not aware of any relationship between Garza and Gonzalez, Jr. (ECF No. 69-11, PageID.602-604.) Defendant Alexander states that he never received a kite from Garza and never spoke with Garza or his family members. Defendant Alexander attests that he had no knowledge that Garza and Gonzalez, Jr. should be separated prior to the assault. (*Id*.)

14) Defendant Cesarek states that she never received a written protection request or kite from Garza, and never spoke with Garza or any of his family members about his fear regarding Gonzalez, Jr. (ECF No. 69-12, PageID.606-608.) She first learned about the relationship between Garza and Gonzalez, Jr. after the assault had taken place. (*Id*.)

Overall, Defendants argue that Garza failed to meet his burden of establishing that each Defendant was on notice that Gonzalez, Jr. was a threat to Garza and that

- 19 -

each Defendant disregarded that risk.  Recognizing that there are two competing versions of the events asserted in this case, Defendants cite *Scott v. Harris*, 550 U.S. 372 (2007) for the proposition that "[w]hen opposing parties tell two different stories, one which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id*. at 380.  Defendants argue that the evidence in the record contradicts Garza's claim that each Defendant knew that Gonzalez, Jr. intended to harm Garza, but took no action to prevent the harm. In *Scott*, the Supreme Court recognized that the facts must be viewed in the light most favorable to the plaintiff. *Id*. at. 377.  The record in *Scott* contained videotape evidence that clearly "discredited" plaintiff's version of the events so "that no reasonable jury could have believed him."  *Id*. at 378-380.

In this case, Garza has asserted that he spoke to each Defendant and sent a kite to each Defendant.   In addition, Garza presented affidavits from prisoner Kempf and his two nieces that set forth details regarding how each Defendant was contacted about the threat of harm from Gonzalez, Jr., before the assault took place. Defendants have presented a different version of the events and present specific evidence that supports the claim that each Defendant had no knowledge of a conflict between Garza and Gonzalez, Jr.   However, taking the facts in the light most favorable to Garza, I respectfully recommend that the Court find that a question of material fact exists on the failure to protect Eighth Amendment claim leading up to

Gonzalez, Jr.'s assault, and conclude that Defendants are not entitled to dismissal of this claim based on qualified immunity.

### 2. Korte's assault on Garza on October 28, 2016

It is undisputed that, after the first attack, Garza returned to MBP and was placed in quarantine until he was released into the general population on October 27, 2016. On October 28, 2016, Garza and Korte were together in the Level V yard. (ECF No. 69-21, PageID.663.) Korte began punching Garza in the face. (*Id*.)

Defendants contend that, prior to his release into the general population, Garza did not express any concerns about returning to the general population and did not express any fear of assault by prisoner Korte. Defendant Niemesto, in fact, says he thought that Garza and Korte were good friends. (ECF No. 69-10, PageID.598.)

Garza asserts that, after the assault, Defendant Lee told him that they had arrested Korte's mother, who was involved in the suboxone smuggling scheme. Garza asserts that since every Defendant had knowledge of the arrest of Korte's mother, they should have known that Korte intended to assault Garza. (ECF No. 74, PageID.685.) Lee denies making this statement. (ECF No. 69-5, PageID.567.)[5]

In the opinion of the undersigned, if Defendants knew that Korte's mother, Stacey Dolson, had been arrested, they would still be unaware of a resulting risk to

---

[5] In addition, Garza has asserted that Stacey Dolson was arrested by the MDOC. However, there is nothing in the record that establishes that Stacey Dolson was arrested. Defendant Lee attests that the Michigan State Police conducted the investigation. (ECF No. 69-5, PageID.566.)

Garza.   The smuggling investigation began in April of 2016, before Garza arrived at MBP.   It began with an investigation of prisoner Korte who was attempting to smuggle suboxone strips into the prison with the aid of his mother Stacey Dolson. (ECF No. 69-5, PageID.566 (affidavit of Lee); ECF No. 69-16, PageID.627 (Michigan State Police report on investigation of Korte's smuggling).)

Garza's involvement was discovered later, in August, as a result of this investigation.   (ECF No. 69-5, PageID.566.)   Assuming each Defendant had knowledge of the investigation, there would be no reason to suspect that Korte would assault Garza based upon Stacey Dolson's alleged arrest.   Garza asserts that Stacey Dolson was arrested because she was involved in the smuggling operation.   Stacey Dolson's involvement was discovered when the MDOC investigated Korte. (ECF No. 69-16, PageID.627 (Michigan State Police report on investigation of Korte's smuggling).)   The investigation then uncovered Garza's involvement.

In the opinion of the undersigned, Garza's claim that Defendants failed to protect him from prisoner Korte's assault should be dismissed, because no Defendant had prior knowledge that Korte would assault Garza and no reasonable person would suspect that Korte would assault Garza simply because Korte's mother had been arrested.

## Retaliation

Plaintiff claims that Defendants retaliated against him by not providing him protection from the two inmates that assaulted him.   Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.   *See*

- 22 -

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).   In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:   (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.   *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Garza argues that each Defendant failed to provide him protection because he and his family members were complaining too much.   Even if Garza can establish that he engaged in protected conduct by kiting each Defendant about his concerns, or by verbally expressing his concerns about assault, there exists no evidence that any Defendant failed to protect him from assault by inmates Gonzalez or Korte due to retaliatory animus.   In the opinion of the undersigned, Defendants are entitled to qualified immunity and summary judgment on Garza's retaliation claims.

### Fourth, Fifth, Ninth, and Fourteenth Amendment claims

Plaintiff alleges that Defendants violated his Fourth, Fifth, Ninth, and Fourteenth Amendment rights.   Plaintiff has failed to explain how Defendants violated each of these rights.   The Fourth Amendment states:

> [1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

[2] No Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.   The first clause, the Reasonableness Clause, provides an overriding check on criminal investigations by the government, prohibiting all "unreasonable searches and seizures." *Soldal v. Cook County*, 506 U.S. 56, 63, (1992). The second clause of the Amendment, the Warrant Clause, sets forth the process for obtaining a warrant to authorize a search.  *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987).   In the opinion of the undersigned, Garza has failed to explain how his Fourth Amendment rights were violated.

In addition, Garza makes a conclusory statement that Defendants actions violated his rights under the Fifth Amendment.   The Double Jeopardy Clause of the Fifth Amendment precludes successive state proceedings that are essentially criminal in nature.  *Breed v. Jones*, 421 U.S. 519, 527-528 (1974).   In *Breed*, the Court noted that criminal proceedings impose heavy pressures and burdens on a person charged.   *Id.* at 529-530.   The purpose of the Double Jeopardy Clause is to ensure that a person not be subject to such a proceeding more than once for the same offense.   *Id.* at 530.

The Fifth Amendment also protects a person's right against self-incrimination. *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1975).   For example, a prisoner may remain silent when charged with a prison rule infraction, but his silence during a prison disciplinary hearing may be weighed against him in determining his guilt.   *Id.* at 316-319.

- 24 -

Garza has failed to allege any facts which would implicate his rights under the Fifth Amendment.

Garza asserts that Defendants violated his Ninth Amendment rights.  The Ninth Amendment states that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX.  Garza has failed to explain how Defendants violated his Ninth Amendment rights.

Garza also asserts a violation of his substantive due process rights under the Fourteenth Amendment, which prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. "Substantive due process prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 431 (6th Cir. 2002). "Substantive due process serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)).

"Where a particular [a]mendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that [a]mendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 266 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  If such an amendment exists,

the substantive due process claim is properly dismissed.  *Heike v. Guevara*, 519 F. App'x 911, 923 (6th Cir. 2013).

In this case, there are specific constitutional amendments that apply to Garza's claims.   For example, the Eighth Amendment provides an explicit source of constitutional protection for Garza's failure to protect claims.  *See Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008) (because the Eighth Amendment supplies the explicit textual source of constitutional protection for claims governing a prisoner's health and safety, the plaintiff's substantive due process claim was subject to dismissal).[6]

### State Law Claims

Garza alleges state law claims of assault and battery, libel and slander, abuse of process, and ethnic intimidation.   Garza has failed to explain how each Defendant was involved in any of the asserted state law claims.   Garza failed to allege any facts that could support state law claims of assault and battery, libel and slander, abuse of process, or ethnic intimidation.   In the opinion of the undersigned, Garza's state law claims should be dismissed.

### Recommendation

For the foregoing reasons, I respectfully recommend that the Court:

1.   Deny Garza's motion for summary judgment.   (ECF No. 77.)

---

[6]    To the extent that Plaintiff is suing the individual Defendants in their official capacities, such claims are barred by the 11th Amendment. *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).

2.    Grant Defendants' motion for summary judgment (ECF No. 68) in part by dismissing Garza's Eighth Amendment failure to protect claim arising out of Korte's assault against Garza on October 28, 2016.

3.    Grant Defendants' motion for summary judgment (ECF No. 68) in part by dismissing Garza's Fourth Amendment, Fifth Amendment, Ninth Amendment, and Fourteenth Amendment claims.

4.    Grant Defendants' motion for summary judgment (ECF No. 68) in part by dismissing the state law claims for assault and battery, libel and slander, abuse of process, and ethnic intimidation.

5.    Deny Defendants' motion for summary judgment (ECF No. 68) as to Garza's Eighth Amendment failure to protect claim arising out of Gonzalez, Jr.'s assault on October 6, 2016.

If the Court accepts this recommendation the only remaining claim will be the Eighth Amendment failure to protect claim arising out of the October 2016 incident involving Gonzalez, Jr.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:      September 11, 2019            /s/ *Maarten Vermaat*
                                          MAARTEN VERMAAT
                                          U.S. MAGISTRATE JUDGE